UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:11-cr-00156-JAW |
| | ) | |
| MATTHEW AYOTTE | ) | |

**ORDER ON ARMED CAREER CRIMINAL ACT STATUS**

Determining whether an offense is a violent felony for purposes of the Armed Career Criminal Act (ACCA) often requires puzzling through confounding abstractions with real life consequences for society, especially for a defendant. The ACCA subjects a felon in possession of a firearm to steeply elevated penalties—including a fifteen-year mandatory minimum term of imprisonment—if he has three previous violent felony convictions. Matthew Ayotte has five prior convictions for offenses that the Government contends qualify as violent felonies. Mr. Ayotte concedes that one of these was for a violent felony; however, he disagrees with the Government as to the remaining four. The Court concludes that two of the four disputed convictions were for violent felonies, giving him a total of three previous violent felony convictions. He must therefore face the ACCA's elevated penalties.

I.    **BACKGROUND**

On February 27, 2012, Matthew Ayotte pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *Minute Entry* (ECF No. 63). Ordinarily, a person who violates 18 U.S.C. § 922(g)(1) faces a statutory maximum of ten years imprisonment. 18 U.S.C. § 924(a)(2). However, under the

ACCA, a person who violates 18 U.S.C. § 922(g)(1) and who has three previous convictions for "a violent felony . . . committed on occasions different from one another" must be imprisoned for a minimum of fifteen years and a maximum of life. 18 U.S.C. § 924(e)(1).

Mr. Ayotte concedes that a March 13, 2000 conviction for Class C Burglary counts as a predicate offense under the ACCA. *Def.'s Mem. Regarding Sentencing*, 24 (ECF No. 72) (*Def.'s Mem.*); *Sentencing Ex. 2B*. The Government contends that four other prior convictions also count: (1) a September 2, 1998 conviction for Class B Gross Sexual Assault, (2) a December 9, 2005 conviction for Class C Assault, (3) a February 16, 2007 conviction for Class C Assault on an Officer, and (4) a March 2, 2010 conviction for Class C Assault. *Gov't's Response to Def.'s Mem. Regarding Sentencing* (ECF No. 79) (*Gov't's Response*); *Gov't's Response to Def.'s Reply Mem. Regarding Sentencing* (ECF No. 84) (*Gov't's Sur-Reply*). Mr. Ayotte disagrees. *Def.'s Mem.*; *Def.'s Reply Mem. Regarding Sentencing* (ECF No. 83) (*Def.'s Reply*).

The stakes are high. If the Court concludes that Mr. Ayotte has three or more prior violent felony convictions, he must be imprisoned for at least fifteen years and likely faces a Guideline range of 235 to 293 months, *Revised Presentence Investigation Report (dated May 15, 2012)* ¶ 79; if the Court concludes he has less than three, he faces a lower Guideline range, which in any case would be capped at the statutory maximum of ten years.

## II.     DISCUSSION

Under the ACCA, "the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that—

> (i)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)    is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

18 U.S.C. § 924(e)(2)(B). "Clause (i) is sometimes referred to as the 'force clause' . . . [and] [t]he portion of clause (ii) following the enumerated offenses is known as the 'residual clause'" or the "otherwise clause." *United States v. Holloway*, 630 F.3d 252, 256 (1st Cir. 2011); *United States v. Jonas*, 689 F.3d 83, 86 (1st Cir. 2012).[1]

"Under binding Supreme Court precedent, [courts] must take a categorical approach to the question of whether a crime ranks as a" violent felony under the ACCA. *Jonas*, 689 F.3d at 86 (citing *Sykes v. United States*, 131 S. Ct. 2267, 2272 (2011)). Courts must generally focus "on the elements of the offense as delineated in the statute of conviction (as judicially glossed) and the standard charging language," rather than "the offender's particular conduct." *Id.* (internal citations omitted). "The key is the crime committed, not the facts of the particular event." *United States v. Giggey*, 589 F.3d 38, 41 (1st Cir. 2009) (*Giggey II*).

---

[1]    Although the First Circuit in *Jonas* was interpreting "crime of violence" under the United States Sentencing Guidelines (specifically U.S.S.G. § 4B1.2(a)), the *Jonas* Court observed that the Guidelines' definition of "crime of violence" is "nearly identical to the definition of a 'violent felony' contained in the [ACCA]" and noted approvingly that "courts have consistently held that decisions construing one of these phrases generally inform the construction of the other." *Jonas*, 689 F.3d at 86; *United States v. Sumrall*, 690 F.3d 42, 42-43 (1st Cir. 2012).

The categorical approach requires a two-step analysis. The first step is "to identify the offense of conviction." *United States v. Davis*, 676 F.3d 3, 8 (1st Cir. 2012). The First Circuit instructed:

> When a state or federal statute of conviction encompasses some conduct that would qualify as a predicate offense under the ACCA . . . and some conduct that would not, governing Supreme Court precedent—as this and most other circuits understand it—requires that we answer two questions:
>
> > (1) whether the statute of conviction (although it encompasses other conduct as well) is divisible so as to create subordinate offenses, at least one of which has elements that make all violations match or fall within a category of predicate offenses triggering an increased penalty; and
> >
> > (2) if so, whether specified limited sources of information (e.g., the indictment or plea colloquy) show that the defendant was convicted under the subordinate offense that corresponds to, or falls within, the ACCA's . . . definition.

*Campbell v. Holder*, 698 F.3d 29, 32-33 (1st Cir. 2012); *see also Taylor v. United States*, 495 U.S. 575, 602 (1990); *Shepard v. United States*, 544 U.S. 13, 26 (2005); *Johnson v. United States*, 559 U.S. 133, 130 S. Ct. 1265, 1273 (2010) ("When the law under which the defendant has been convicted contains statutory phrases that cover several different generic crimes . . . the 'modified categorical approach' that we have approved permits a court to determine which statutory phrase was the basis for the conviction by consulting the trial record") (internal citation omitted). To identify a narrow offense of conviction within a broad statute, however, *Taylor / Shepard* documents must establish that a prior conviction "necessarily involved (and a prior plea necessarily admitted)" the elements of the more narrowly-defined offense. *Shepard*, 544 U.S. at 24. A "broader evidentiary enquiry" into the facts underlying

the conviction could amount to unconstitutional judicial fact-finding. *Id.* at 24-26 (discussing *Almendarez-Torres v. United States*, 523 U.S. 224 (1998); *Jones v. United States*, 526 U.S. 227 (1999); and *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). Accordingly, "inferences from the record of conviction must be 'necessary,' not merely 'reasonable.'" *Patel v. Holder*, 707 F.3d 77, 2013 U.S. App. LEXIS 2315, *15 (1st Cir. 2013) (quoting with approval *Renteria-Morales v. Mukasey*, 551 F.3d 1076, 1085 (9th Cir. 2008)).[2] If *Taylor / Shepard* documents do not narrow the offense of conviction to one that is categorically a violent felony, and "if at least one of the possible offenses of conviction would not qualify as a violent felony, the conviction is unusable for ACCA purposes." *Holloway*, 630 F.3d at 257.

The second step is to determine whether the offense of conviction qualifies as a violent felony. There are three ways for an offense to qualify: (1) under the force clause; (2) as an enumerated offense; or (3) under the residual clause. Again, the determination must be categorical: the Court must "focus on the elements of the offense" and "eschew consideration of the offender's particular conduct." *Jonas*, 689 F.3d at 86. State law determines the breadth of state crimes, but whether an offense of conviction qualifies as a violent felony under the ACCA is a question of federal law. *Holloway*, 630 F.3d at 259-60 ("[I]n *Johnson*, the Court emphasized that it was bound by the Florida Supreme Court's interpretation of the battery offense at issue"); *Jonas*, 689 F.3d at 87 ("Determining whether [the residual

---

[2]      *Patel* is a removal case; however, the First Circuit has observed that the ACCA provisions for determining whether to enhance a sentence are analogous. *Campbell*, 698 F.3d at 32-36.

clause's degree of risk and similar in kind requirements] are satisfied is a matter of federal law").

Federal courts have added considerable gloss to the ACCA's text. The force clause "applies only where the offense at issue has as an element the use of 'violent force—that is, force capable of causing physical pain or injury to another person.'" *Holloway*, 630 F.3d at 258 (quoting *Johnson v. United States*, 559 U.S. 133, 130 S. Ct. 1265, 1271 (2010)). The enumerated defenses—arson, burglary, and extortion—"must have some uniform definition independent of the labels employed by the various States' criminal codes." *Taylor*, 495 U.S. at 592. That uniform definition is supplied by federal common law, which provides, for instance, that "burglary" under the ACCA means "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Id.* at 599.

The residual clause presents the greatest interpretive challenge. Recently, the Supreme Court "has issued four opinions interpreting the clause in as many years and provided at least four tests to determine whether a crime meets its definition." *United States v. Oliveira*, 798 F. Supp. 2d 319, 328 (D. Mass. 2011) (Gertner, J.), *vacated*, Nos. 11-2020, 11-2071, 2012 U.S. App. LEXIS 20837 (1st Cir. Oct. 3, 2012) (per curiam); *see James v. United States*, 550 U.S. 192 (2007) (holding that attempted burglary is a violent felony); *Begay v. United States*, 553 U.S. 137 (2008) (holding that driving under the influence of alcohol is not); *Chambers v. United States*, 555 U.S. 122 (2009) (holding that failure to report for weekend

confinement is not); *Sykes*, 131 S. Ct. 2267 (holding that vehicle flight from a law enforcement officer is). In these cases, the Supreme Court resolved four circuit splits concerning particular offenses, but many persist. Following *Sykes*, the most recent Supreme Court case interpreting the residual clause, the First Circuit described the proper analysis:

> To qualify as a [violent felony] under the otherwise clause, an offense must (1) present a degree of risk similar to the degree of risk posed by the enumerated offenses, and (2) be roughly similar in kind to the enumerated offenses. With respect to the first of these criteria (degree of risk), the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another. This determination hinges on a commonsense assessment of the risk of violence that typically ensues during the commission of the crime.

> With respect to the second criterion (similar in kind), offenses that involve stringent mens rea requirements are easily captured. Strict liability, negligence, or recklessness crimes are more elusive.

> The Supreme Court has crafted a touchstone for the similar in kind inquiry: courts must ask whether, categorically speaking, putative predicate offenses involve "purposeful, violent, and aggressive conduct." This question is sometimes difficult to answer. Adjectives like "purposeful" and "aggressive" denote qualities that are ineluctably manifested in degree and appear in different combinations; they are, therefore, imprecise aids. Mindful of this inherent imprecision, we have emphasized that an offense need only be roughly similar in kind to the enumerated offenses.

*Jonas*, 689 F.3d at 86-87 (internal citations and punctuation omitted).

### A. The 1998 Gross Sexual Assault Conviction

#### 1. Step One: Identifying the Offense of Conviction

Matthew Ayotte was convicted on September 2, 1998, of Gross Sexual Assault, a Class B violation of 17-A M.R.S. § 253, following a guilty plea. *Sentencing Ex. 1C (J. and Commitment)*. The Judgment does not specify which

subsection of 17-A M.R.S. § 253 Mr. Ayotte violated; in 1998, there were at least six different types of Class B violations of 17-A M.R.S. § 253. *Sentencing Ex. 1C*; 17-A M.R.S. § 253(5) (1998) ("Violation of subsection 2, paragraph A, B, C, D, E or H is a Class B crime"). The Court looks to Mr. Ayotte's Indictment to determine whether it identifies the offense of conviction. *See Giggey II*, 589 F.3d at 41. The Indictment, as amended, charged:

> That on or about September 11, 1997, at Presque Isle, Aroostook County, Maine, **MATTHEW L. AYOTTE** did engage in a sexual act with R.C. **MATTHEW L. AYOTTE** compelled or induced R.C. to engage in the sexual act by threat. The sexual act involved direct physical contact between the genitals of **MATTHEW L. AYOTTE** and the genitals of R.C.

*Sentencing Exs. 1A* (*Indictment*), *1B* (*Mot. to Amend Indictment*). The charge in the Amended Indictment would sustain a conviction under only 17-A M.R.S. § 253(2)(B) (1998), which provides:

> A person is guilty of gross sexual assault if that person engages in a sexual act with another person and [t]he actor compels or induces the other person to engage in the sexual act by any threat.

17-A M.R.S. § 253(2)(B) (1998). The last sentence of the Amended Indictment makes clear that the charge incorporated the first of three statutory definitions of "sexual act": "Any act between 2 persons involving direct physical contact between . . . the genitals of one and the genitals of the other." 17-A M.R.S. § 251(1)(C)(1) (1998).[3] Although 17-A M.R.S. § 253(2)(B) might be further sub-divided—for instance, between offenses involving compulsion and offenses involving

---

[3] The other two statutory definitions of "sexual act" include sexual contact with an animal and contact between the genitals or anus of one and an instrument or device manipulated by another for sexual gratification. 17-A M.R.S. § 251(C)(2)-(3) (1998). The Amended Indictment alleges neither alternative definition.

inducement—*Taylor* / *Shepard* documents permit no further narrowing in Mr. Ayotte's case.

### 2. Step Two: Determining Whether the Offense of Conviction Is Categorically a Violent Felony

The second step is to determine whether a violation of 17-A M.R.S. § 253(2)(B) counts, categorically, as an ACCA violent felony.

### a. The Force Clause

The Government contends that this conviction qualifies under the force clause, relying on 17-A M.R.S. § 251(1)(E), which defines "compulsion" to mean the use of physical force and/or a threat to use physical force. *Gov't's Response to Def.'s Mem. Regarding Sentencing*, 20 (ECF No. 79) (*Gov't's Response*). The flaw in this argument is that both 17-A M.R.S. § 253(2)(B) and the Amended Indictment use the language "compels or induces." This statutory language contrasts with 17-A M.R.S. § 253(1)(A), a more serious offense in which a person engages "in a sexual act with another person and [t]he other person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E." 17-A M.R.S. § 253(1)(A) (1998); *id.* § 253(4) (labeling a violation of § 253(1) as a Class A crime). "Compulsion" is defined as "the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being." 17-A M.R.S. § 251(1)(E) (1998). By contrast, section 253(2)(B) criminalizes a broader range of conduct as a Class B crime. 17-A M.R.S. § 253(2)(B) (1998); *id.* § 253(5) (labeling a

violation of § 253(2)(B) as a Class B crime).  Section 253(2)(B), which can be violated

by "induc[ing] the other person to engage in the sexual act by any threat," is not

limited by statute to physical force or the threat thereof.  17-A M.R.S. § 253(2)(B).

Maine's criminal code does not define "induces" or "any threat" as used in 17-

A M.R.S. § 253(2)(B), but Maine courts have concluded that 17-A M.R.S. § 253(2)(B)

proscribes sexual acts induced by non-physical threats.  In *State v. Colson*, 405 A.2d

717 (Me. 1979), the Maine Supreme Judicial Court explained the distinction

between Class A and Class C gross sexual misconduct under a predecessor statute:

> If a defendant uses a threat (whether express or implied) of death,
> serious bodily injury, or kidnapping to compel another person to
> engage in . . . a sexual act, he may be convicted of . . . Class A gross
> sexual misconduct . . . .  On the other hand, . . . a sexual act compelled
> or induced by use of any lesser threat (whether express or implied)
> gives rise only to liability . . . for Class C gross sexual misconduct.

*Id.* at 720.  The *Colson* Court observed that the drafters of the Criminal Code

recognized that "as the magnitude of the threat diminishes, the line between

compulsion and consent becomes less clear."  *Id.*  The *Colson* Court quoted the

authors of the Model Penal Code:

> As the gravity of the threat diminishes, the situation gradually
> changes from one where compulsion overwhelms the will of the victim
> to a situation where she can make a deliberate choice to avoid some
> alternative evil.  The man may threaten to disclose an illicit affair, to
> foreclose the mortgage on her parents' farm, to cause her to lose her
> job, or to deprive her of a valued possession.  The situation may move
> into a shadow area between coercion and bargain.

*Id.* (quoting *Model Penal Code* § 207.4, Comment (Tent. Draft No. 4, 1955)).  Thus,

as interpreted by the Maine Supreme Judicial Court, "any threat" includes non-

physical threats.  17-A M.R.S. § 253(2)(B) (1998).

Although the statute has been amended since *Colson*, it retained in 1998 (when Mr. Ayotte was convicted) the categorical distinction discussed in *Colson*: a Class A gross sexual assault required physical force or the threat thereof, whereas although a Class B gross sexual assault could involve a threat of less serious physical force, it could also involve a non-physical threat. *See* 17-A M.R.S. §§ 251(1)(e), 253(1)(A), 253(2)(B) (1998); *State v. Levasseur*, 538 A.2d 764, 766 (Me. 1988) (citing *Colson*, 405 A.2d at 719-20); *State v. Meyer*, 497 A.2d 1127, 1128 (Me. 1985). The Court concludes that a violation of 17-A M.R.S. § 253(2)(B) does not "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person of another" and therefore does not qualify as a violent felony under the ACCA's force clause. 18 U.S.C. § 924(e)(2)(B)(i).

### b. Extortion

Extortion is an enumerated offense under the ACCA. 18 U.S.C. § 924(e)(2)(B)(ii). In *United States v. DeLuca*, 17 F.3d 6 (1st Cir. 1994), the First Circuit held that extortion "should be given [its] common usage" and described Rhode Island's extortion statute as "a garden-variety extortion statute."[4] *Id.* at 9. The *DeLuca* Court rejected the argument that extortion "only describes crimes that involve threats against the person of another." The Rhode Island extortion statute discussed in *DeLuca* provided in part:

> Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense or by a verbal or written communication maliciously threatens any injury to

---

[4] *DeLuca* concerned "crimes of violence" under the Guidelines rather than "violent felonies" under the ACCA, but as noted the two bodies of law are generally interchangeable. The Court sees no reason to give extortion a different definition under the ACCA than under the Guidelines.

the person, reputation, property or financial condition of another, or threatens to engage in other criminal conduct with intent thereby to extort money or any unlawful pecuniary advantage, or with intent to compel any person to do any act against his will, or to prohibit any person from carrying out a duty imposed by law shall be punished [as provided by law].

*Id.* at 7 n.2 (quoting *R.I. Gen. Laws § 11-42-2*).  Rhode Island's extortion statute sweeps within it, for instance, a threat to injure the "reputation, property or financial condition of another . . . with intent to compel any person to do any act against his will."  *Id.* at 8.  Under this definition, compelling or inducing another to engage in a sexual act "by any threat" could be described as a type of extortion.  17-A M.R.S. § 253(2)(B) (1998).

The First Circuit also looked to the Model Penal Code's "widely accepted" definition of extortion.  *Id.* at 9.  The Model Penal Code defines extortion as "purposefully obtaining the property of another by threatening to:

(1) inflict bodily injury on anyone or commit any other criminal offense; or

(2) accuse anyone of a criminal offense; or

(3) expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute; or

(4) take or withhold action as an official, or cause an official to take or withhold action; or

(5) bring about or continue a strike, boycott or other collective unofficial action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act; or

(6) testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

(7) inflict any other harm which would not benefit the actor."

*Id.* at 9 (quoting Model Penal Code § 223.4 (1980)). The Model Penal Code's definition of extortion is narrower than the Rhode Island definition in one sense, as it restricts the sought-after result to "obtaining the property of another." If the Model Penal Code's definition applies, then a violation of 17-A M.R.S. § 253(2)(B) would not qualify as an enumerated offense.

### c.    The Residual Clause

Even if a violation of 17-A M.R.S. § 253(2)(B) is not considered "extortion," it fits within the residual clause under First Circuit precedent since it is "roughly similar in kind" to extortion and presents "a degree of risk similar to the degree of risk posed by [extortion]." *Jonas*, 689 F.3d at 86-87. Indeed, if extortion is given its Model Penal Code definition, extortion would generally present a lower "potential risk of physical injury to another" than a violation of 17-A M.R.S. § 253(2)(B) since extortion can be accomplished—and presumably often is accomplished—without either physical contact or physical threat. 18 U.S.C. § 924(e)(2)(B)(ii). By contrast, a violation of 17-A M.R.S. § 253(2)(B) necessarily involves a compelled or induced sexual act. As a matter of common sense, a threat that results in a transfer of property has less potential for physical violence than a threat that results in a sexual act. *See Jonas*, 689 F.3d at 89.

The Court's conclusion that a violation of 17-A M.R.S. § 253(2)(B) qualifies as a violent felony under the residual clause finds a measure of additional support in *United States v. Leahy*, 473 F.3d 401 (1st Cir. 2007). In *Leahy*, the First Circuit held that a Massachusetts conviction for indecent assault and battery on a person at least fourteen years old qualified as a violent felony under the residual clause. *Id.* at 410-12. This conclusion was driven by the non-consensual nature of the offense. *Id.* at 411 ("[s]ince the crime involves a non-consensual act upon another person, there is a substantial risk that physical force may be used in the course of committing the offense") (quoting *Sutherland v. Reno*, 228 F.3d 171, 176 (2d Cir. 2000)). Here, by contrast, the Maine Law Court has made clear that lack of consent is not an element of 17-A M.R.S. § 253(2)(B). *State v. Saucier*, 421 A.2d 57, 58 (Me. 1980) ("While sexual intercourse resulting from a bargain for gain would obviously not be within the scope of section 253(2)(B), the statute is clearly designed to reach certain situations where the victim does, in some sense, acquiesce in the sexual activity"). Nevertheless, as the Defendant acknowledges, a violation of 17-A M.R.S. § 253(2)(B) "undoubtedly involves proof that unwanted and offensive conduct occurred." *Def.'s Mem.* at 15. Although *Leahy* alone does not compel the conclusion that sexual assault by threat is a violent felony, it is consistent with that conclusion.[5]

---

[5] Counting a violation of 17-A M.R.S. § 253(2)(B) as a violent felony is also generally consistent with *United States v. Cadieux*, 500 F.3d 37 (1st Cir. 2007), which concluded that indecent assault and battery on a child under 14 constituted a violent felony under the ACCA. At the same time, the Court acknowledges that in *Cadieux*, the First Circuit focused on the lack of consent and age of the victim and the risk of physical violence inherent in sexual assaults against children. *Id.* at 44-47. Some of the *Cadieux* Court's concerns about the intimate nature of sexual assault and the risk of

### B.     The 2005 Assault Conviction

#### 1.     Step One: Identifying the Offense of Conviction

On December 9, 2005, Mr. Ayotte was convicted of Assault, a violation of 17-A M.R.S. § 207(1)(A), following a guilty plea.  *Sentencing Ex. 3C* (*J. and Commitment*). Ordinarily a Class D offense, Mr. Ayotte's conviction was elevated to Class C based on his criminal history, pursuant to 17-A M.R.S. § 1252(4-A).[6]

The Maine statute under which Mr. Ayotte was convicted reads in part:

(1)  A person is guilty of assault if:

> (A) The person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person. Violation of this paragraph is a Class D crime.

17-A M.R.S. § 207(1)(A) (2005).  The sentencing class for the offense was elevated to Class C pursuant to 17-A M.R.S. § 1252(4-A), which provides, in part:

> If the State pleads and proves that, at the time any [specified] crime . . . was committed, the defendant had been convicted of 2 or more [specified] crimes . . . the sentencing class for the crime is one class higher than it would otherwise be.

17-A M.R.S. § 1252(4-A) (2005).

Mr. Ayotte was convicted under a statute that defines assault disjunctively based on different levels of intentionality ("intentionally, knowingly or recklessly") and different results ("bodily injury or offensive physical contact").

---

physical violence would be applicable to "unwanted and offensive" adult sexual assaults. Nevertheless, though consistent with this Court's conclusions, *Cadieux* stands on its own facts.

[6]     Some of the official court records indicate that Mr. Ayotte was convicted of violating 17-A M.R.S. § 207(1)(B) rather than (1)(A).  *See Sentencing Ex. 3C* (*J. and Commitment*); *Sentencing Ex. 3E (Charge 6)* (*Docket Record*).  However, the indictment charged Mr. Ayotte with violating (1)(A), and the briefs state that Mr. Ayotte was convicted under (1)(A).  *See Sentencing Ex. 3A (Count 6)* (*Indictment*); *Def.'s Sentencing Mem.* at 21; *Gov't's Response* at 26 ("Defendant was also convicted of Assault (Class C) in violation of Title 17-A M.R.S.A. §§ 207(1)(A) and 1252(4-A) on or about December 9, 2005").

The indictment mimics the disjunctive statutory language and does not narrow the offense of conviction:

> On or about May 1, 2005, in Greenbush, Penobscot County, Maine, **MATTHEW AYOTTE**, did intentionally, knowingly, or recklessly cause bodily injury or offensive physical contact to Douglas Smith. **MATTHEW AYOTTE** was convicted of Gross Sexual Assault on September 2, 1998, in the Aroostook County Superior Court, Docket No. 1997-463, and of Assault on August 1, 2001, in the District Court, Bangor, Maine, Docket No. 2001-2240.

*Sentencing Ex. 3A* (*Count 6*) (*Indictment*). The plea colloquy includes the following statement of the Government's evidence:

> THE COURT: Could the State indicate what the facts would be if this matter went to trial?
>
> MR. LARSON: Your Honor, if this matter had gone to trial, the State would present evidence by Douglas Smith, a deputy with the Penobscot County Sheriff's Department, that in the early morning hours of May 1, 2005, he had arrested Mr. Ayotte on an unrelated matter and was transporting him to the Penobscot County Jail. He would also testify that Mr. Ayotte was very intoxicated and very agitated with regard to the earlier incident in the evening.
>
> In the process of transporting Mr. Ayotte, Mr. Ayotte became upset that he had a cut on his head, that had been bandaged by an EMT and Mr. Ayotte was able to remove the bandage from his head and began spitting and shaking blood all over Deputy Smith. Deputy Smith found these actions to be offensive and he was able to eventually subdue Mr. Ayotte while he was still in the cruiser with the aid of another officer while an ambulance arrived at the scene to assist the transport.

*Gov't's Sur-Reply* Attach. 1, *Rule 11 Hearing & Sentencing*, 5:9-6:4 (ECF No. 84-1)

(*2005 Assault Colloquy*). After a discussion with Mr. Ayotte's defense counsel, the Superior Court Justice turned to Mr. Ayotte and the following colloquy ensued:

> THE COURT: Okay. Mr. Ayotte, let me ask you, do you believe the facts, as presented by the State, if presented to a jury, could result in a finding of guilt beyond a reasonable doubt?

THE DEFENDANT: Honestly, I don't know.  I was handcuffed in the car which I needed 17 stitches in my forehead.  I was bleeding all over myself.  And I had a bandage patched across my face.  I was awhile in the car.  I couldn't move.  I was bleeding all over the place and spit out blood from my mouth, and I don't know how that constitutes assault towards an officer, but because of my past criminal history and because I have a job opportunity in the next -- well, I have a job opportunity lined up in about the next month and this is a plea bargain so that I can take care of this now and go to work as soon as I am released.

THE COURT: Okay.  My question to you is, I understand you question the facts given by the State, do you believe or do you understand that if these facts were presented to a jury that it could result in their finding of guilt beyond a reasonable doubt?

THE DEFENDANT: Yes, I do understand.

THE COURT: Even though you dispute some of the facts?

THE DEFENDANT: Yes, I understand.

*Id.* 6:24-7:23.  The Government contends that "[w]hat the plea colloquy establishes is that Defendant's 2005 assault conviction was an assault on a law enforcement officer by spitting blood and shaking blood on Deputy Smith . . . .  Not only was the assault violent in nature but it took two officers to subdue Defendant Ayotte after the violent assault."  *Gov't's Sur-Reply* at 13.

Thus, the Government refers to the plea colloquy not only to establish "which statutory phrase was the basis for the conviction."  *Johnson*, 130 S. Ct. at 1273.  Rather, the Government urges the Court to use the plea colloquy to divine the nature and circumstances of the conduct that led to Mr. Ayotte's conviction, including the identity of the victim.  However, the First Circuit has instructed that, in making the modified categorical assessment the ACCA requires, courts must

generally "eschew consideration of the offender's particular conduct." *Jonas*, 689 F.3d at 86; *Giggey II*, 589 F.3d at 41 ("As *Taylor* explained, sentencing courts may 'look[ ] only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions'") (quoting *Taylor*, 495 U.S. at 600). Thus, despite the Government's urging, the Court may not look to the plea colloquy to ascertain a particular fact that is not part of the statutory definition of the offense.

By contrast, Mr. Ayotte's 2007 conviction for Assault on an Officer, a violation of 17-A M.R.S. §752-A, required the state of Maine to prove the identity of the victim as an officer as an element of the offense. In that case, the Court may consider the victim's identity under a modified categorical approach. In 2005, however, the state of Maine charged Mr. Ayotte with simple assault rather than assault on an officer. The Court may consider only Mr. Ayotte's actual conviction under the ACCA.

Regarding Mr. Ayotte's level of intentionality, the colloquy indicates that he spit blood while being transported by Deputy Smith, and amply supports the conclusion that he acted at least recklessly. 17-A M.R.S. § 35(3)(A) (2005) ("A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that this conduct will cause such a result"). However, the colloquy does not support any further inferences about Mr. Ayotte's state of mind or intentions other than that he was "very intoxicated" at the time and, in particular, does not compel the conclusion that he intended or knew that his conduct would

cause bodily injury or offensive physical contact. *See* 17-A M.R.S. § 35(1)(A) (2005) ("A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result"); 17-A M.R.S. § 35(2)(A) (2005) ("A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result"). The colloquy therefore does not support narrowing his offense of conviction from a "reckless, knowing, or intentional" assault to a "knowing or intentional" assault. *Cf. Johnson*, 130 S. Ct. at 1269 ("nothing in the record . . . permitted the District Court to conclude that [the conviction] rested upon anything more than the least of [several disjunctive statutory definitions of the offense]").

### 2. Step Two: Determining Whether the Offense of Conviction Is Categorically a Violent Felony

In *Holloway*, the First Circuit held that reckless battery "is categorically not a violent felony." *Holloway*, 630 F.3d at 261. The *Holloway* Court instructed that if *Taylor* / *Shepard* documents "do not identify the offense of conviction," and "if at least one of the possible offenses of conviction would not qualify as a violent felony, the conviction is unusable for ACCA purposes." *Holloway*, 630 F.3d at 257. Here, the statute under which Mr. Ayotte was convicted includes reckless assault, and the *Taylor* / *Shepard* documents do not support narrowing the offense of conviction to exclude reckless assault. As reckless assault is categorically not a violent felony, Mr. Ayotte's 2005 Assault conviction is "unusable for ACCA purposes." *Id.*

### C. The 2007 Assault on an Officer Conviction

On February 16, 2007, Mr. Ayotte was convicted of Assault on an Officer, a violation of 17-A M.R.S. § 752-A(1)(B), following a guilty plea. *Sentencing Ex. 4B* (*J. and Commitment*). The Maine statute under which Mr. Ayotte was convicted reads in part:

> (1) A person is guilty of assault on an officer if:
> . . .
>> (B) While in custody pursuant to an arrest or pursuant to a court order, the person commits an assault on a corrections officer, corrections supervisor or another member of the staff of an institution while the staff member is performing official duties. As used in this paragraph, "assault" means the crime defined in section 207, subsection 1, paragraph A.

17-A M.R.S. § 752-A(1)(B) (2007). Section 207(1)(A) reads:

> A person is guilty of assault if the person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person.

17-A M.R.S. § 207(1)(A) (2007).

In *Jonas*, the First Circuit held that the Massachusetts crime "assault and battery on a correctional officer (ABCO)" qualified as a "crime of violence" under the residual clause. *Jonas*, 689 F.3d at 89. The First Circuit reasoned:

> Assault and battery on a correctional officer (even an unarmed correctional officer) is like throwing a lit match into a tinder box: it inevitably "creates a risk that fellow inmates will join in the disturbance, oppose it with force, or simply use its occurrence to engage in other acts of violence." *Johnson*, 616 F.3d at 94. The setting is the key: "[t]he risk of physical injury arises not only from this confrontation, but also from the fact that prisons are like powder kegs, where even the slightest disturbance can have explosive consequences." *Id.*

*Jonas*, 689 F.3d at 89.

Although the *Jonas* Court noted that "[u]nder the relevant Massachusetts statute, assault and battery can be committed in various ways—some that may involve the use of violent force and some that may not," it did not distinguish between forceful and non-forceful assault in holding that, when the victim of an assault and battery is a correctional officer, the offense qualifies as a crime of violence under the residual clause. *Id.* at 86.

In the face of this compelling authority, Mr. Ayotte nevertheless argues that his conviction is distinguishable from that in *Jonas* because, under the Maine statute, "[a]ssaults on corrections officers may include offensive physical contact cases."[7] *Def.'s Reply* at 4-5. To support this argument, he cites *United States v. Hampton*, 675 F.3d 720 (7th Cir. 2012), which held that an aggravated battery conviction for making insulting or provoking physical contact with a peace officer did not qualify as a violent felony under the residual clause. *Id.* at 731. The residual clause has given rise to many circuit splits, and this may be yet another. In this District, however, First Circuit precedent is law, and Mr. Ayotte has identified no meaningful distinction between his conviction and the one in *Jonas*. The Court concludes that his 2007 Assault on an Officer conviction must be counted as an ACCA violent felony.

### D. The 2010 Assault Conviction

#### 1. Step One: Identifying the Offense of Conviction

---

[7] It is unnecessary to look to *Taylor / Shepard* documents to narrow Mr. Ayotte's offense of conviction because the Court concludes that *Jonas* requires it to count any violation of 17-A M.R.S. § 752-A(1)(B) as a violent felony under the residual clause.

On March 2, 2010, Mr. Ayotte was convicted of Assault, a violation of 17-A M.R.S. § 207(1)(A), following a guilty plea. *Sentencing Ex. 5B* (*J. and Commitment*). Ordinarily a Class D offense, Mr. Ayotte's conviction was elevated to Class C based on his criminal history, pursuant to 17-A M.R.S. § 1252(4-A). *Id.*; *Sentencing Ex. 5A* (*Indictment*).

The Maine statute under which Mr. Ayotte was convicted reads in part:

(1) A person is guilty of assault if:

> (A) The person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person. Violation of this paragraph is a Class D crime.

17-A M.R.S. § 207(1)(A) (2010). The sentencing class for the offense was elevated to Class C pursuant to 17-A M.R.S. § 1252(4-A), which provides, in part:

> If the State pleads and proves that, at the time any [specified] crime . . . was committed, the defendant had 2 or more [specified] prior convictions . . . the sentencing class for the crime is one class higher than it would otherwise be.

17-A M.R.S. § 1252(4-A) (2010).

### a. Permissible Scope of a Plea Colloquy Examination

Just as in 2005, Mr. Ayotte was convicted under a statute that defines assault disjunctively based on different levels of intentionality ("intentionally, knowingly or recklessly") and different results ("bodily injury or offensive physical contact"). As the Court discussed in connection with the 2005 Assault conviction, the First Circuit has held that reckless assault is categorically not a violent felony. *Holloway*, 630 F.3d at 261. The difference between the 2005 and 2010 Assault convictions is that in the plea colloquy for the 2010 conviction, Mr. Ayotte admitted

facts that support a reasonable inference that he knowingly or intentionally caused bodily injury to another person. The Court concludes, however, that the plea colloquy does not support a "necessary" inference that Mr. Ayotte acted knowingly or intentionally, and that the plea colloquy may not be used to narrow his offense of conviction.

*Taylor* and *Shepard* present a riddle. *Campbell*, 698 F.3d at 35 ("Every solution to the riddle of determining the 'crime of conviction' in cases of broadly-defined offenses poses problems"). They instruct that, when the statute of conviction includes both violent and non-violent felonies, a court may examine a plea colloquy to determine "whether the plea had 'necessarily' rested on the fact" qualifying the offense of conviction as a violent felony. *Shepard*, 544 U.S. at 21 (quoting *Taylor*, 495 U.S. at 602). But when the statute of conviction is broad enough to sweep in both violent and non-violent felonies—necessitating a *Taylor* / *Shepard* analysis—the key fact under the ACCA typically holds little or no significance under the statute of conviction, so a plea is unlikely to "necessarily" rest on that fact.

To make this point concrete, here the ACCA determination turns in part on Mr. Ayotte's mens rea, since reckless assault is categorically not a violent felony. Maine law, however, does not distinguish between reckless and knowing or intentional assault: they are both violations of 17-A M.R.S. § 207(1)(A). At Mr. Ayotte's Rule 11 hearing, the state court was required to find that there was a sufficient factual basis to accept a plea of guilty to a violation of 17-A M.R.S. §

207(1)(A).  The state court was not required to decide whether Mr. Ayotte acted knowingly or intentionally, as opposed to recklessly.

In *Shepard*, the Supreme Court discussed this issue:

> The problem is that "what the state court . . . has been 'required to find'" is debatable.  In a nongeneric State, the fact necessary to show a generic crime is not established by the record of conviction as it would be in a generic State when a judicial finding of a disputed prior conviction is made on the authority of *Almendarez-Torres v. United States*, 523 U.S. 224 (1998).[8]  The state statute requires no finding of generic burglary, and without a charging document that narrows the charge to generic limits, the only certainty of a generic finding lies in jury instructions, or bench-trial findings and rulings, or (in a pleaded case) in the defendant's own admissions or accepted findings of fact confirming the factual basis for a valid plea.

*Shepard*, 544 U.S. at 25.  The Supreme Court has acknowledged that the categorical approach is "not always easy to apply," *Nijhawan v. Holder*, 557 U.S. 29, 35 (2009), and the First Circuit has recently observed that "[b]ecause of the vagaries of statute drafting, the Taylor-Shepard methodology has proved far more difficult to apply than the Supreme Court may have anticipated."  *Campbell v. Holder*, 698 F.3d 29, 34 (1st Cir. 2012).

The Supreme Court has identified two concerns that support a narrow view of the plea colloquy.  The first is that "allowing a broader evidentiary enquiry" could jeopardize the defendant's Sixth Amendment right "that any fact other than a prior conviction sufficient to raise the limit of the possible federal sentence must be found by a jury."  *Shepard*, 544 U.S. at 24-26; *see Taylor*, 495 U.S. at 601-02 ("If the sentencing court were to conclude, from its own review of the record, that the

---

[8]    By "nongeneric State," the Supreme Court was referring to a state whose definition of burglary differed from the "generic" definition the Court has endorsed under the ACCA.

defendant actually committed a generic burglary, could the defendant challenge this conclusion as abridging his right to a jury trial?"). The second is that "the practical difficulties and potential unfairness of a factual approach are daunting." *Id.* at 20 (quoting *Taylor*, 495 U.S. at 601). "Potential unfairness" would likely result from holding a defendant to facts he admitted in a hearing where he had no immediate reason not to admit them. For instance, had Mr. Ayotte been aware that a federal court would later be analyzing the plea colloquy to determine whether he should be deemed an armed career criminal and that the decision could ride on the distinction between recklessness and knowledge or intent in his 2010 Assault, he may well have given more thought to his statements.

### b. Mens Rea

"When a state or federal statute of conviction encompasses some conduct that would qualify as a predicate offense under the ACCA . . . and some conduct that would not," a court may consult *Taylor / Shepard* documents. *Campbell*, 698 F.3d at 32. "[U]nder Taylor-Shepard, the facts underlying the conviction are relevant, if at all, only to identify which crime is the crime of conviction where (as is often true with divisible statutes) it is unclear which subsumed offense the defendant pled to or was found to have violated." *Id.* at 33. Thus, in *Holloway*, the First Circuit broke the commonwealth of Massachusetts simple assault and battery statute into "three types of battery: (1) harmful battery; (2) offensive battery; and (3) reckless battery," *Holloway*, 630 F.3d at 257, and noted that "[c]ourts may consider limited evidence—

such as charging documents and jury instructions—that show which one of the prohibited offenses the defendant was convicted of committing." *Id.* at 259.

The question here is slightly different. As *Holloway* pointed out, "Massachusetts law distinguishes between intentional and reckless batteries." *Id.* at 262. Here, Maine law arguably treats simple assault as a single crime that may be committed with different levels of intent, ranging from reckless to intentional action. The unanswered question is whether a sentencing court may use *Taylor / Shepard* documents not to identify which crime among several in the statute of conviction was the crime of conviction, but to identify the degree of intentionality with which the defendant actually acted. *Johnson* permits a court to review *Taylor / Shepard* documents to determine "which statutory phrase was the basis for the conviction." *Johnson*, 130 S. Ct. at 1273. But where state law draws no distinction among reckless, knowing, and intentional assaults, and this disjunctive language is used in the charging document, it is not clear that a court may use *Taylor / Shepard* documents to identify the defendant's mens rea as knowledge or intent without engaging in impermissible judicial fact-finding.

### c. Analysis of the *Taylor / Shepard* Documents

Although the plea colloquy strongly suggests Mr. Ayotte acted intentionally or knowingly, and not recklessly, when he slammed a door on Adam Stump's face, the Court cannot conclude that the *Taylor / Shepard* documents necessarily establish that he did so either intentionally or knowingly.

The indictment mimics the disjunctive statutory language and does not narrow the offense of conviction:

> On or about September 30, 2009, in Bangor, Penobscot County, Maine, **MATTHEW L. AYOTTE**, did intentionally, knowingly, or recklessly cause bodily injury or offensive physical contact to Adam Stump. **MATTHEW L. AYOTTE** was convicted of ASSAULT on December 1, 2008, in the Penobscot County Superior Court, Docket No. BANSC-CR-08-1148, and of ASSAULT on February 16, 2007, in the Penobscot County Superior Court, Docket No. BANSC-CR-07-135.

*Sentencing Ex. 5A* (*Count 1*) (*Indictment*). The plea colloquy includes the following statement of the Government's evidence:

> THE COURT: All right. Ms. Clifford, would you please describe the evidence you believe would be admissible and sufficient to carry the burden of proof if the matters -- matter proceeded to trial?

> MS. CLIFFORD: Thank you, Your Honor. The State would expect testimony from Adam Stump to testify that he was an employee at the Family Dollar Store and that back on September 30th of 2009 he was -- they were -- he was closing up the store. There -- he was walking out with one of the last customers, and he was going to close or lock the door behind the customer. While he was doing so, the defendant came in. And Mr. Stump told him that they were closed, that he could not enter, and that the defendant walked past Mr. Stump and walked up to Michelle Paul, who is another employee there. The defendant knew Michelle Paul.

> The -- the customer asked Adam Stump if he wanted her to call the police. He responded no, that -- that Ms. Paul appeared to know the defendant. That customer left.

> Adam Stump would testify that he remained in the -- in the store, in the registry area, while -- register area while the defendant spoke to Michelle Paul. And then the defendant started to walk towards the door, and Adam walked along with him, because he was going to lock -- unlock the door so the defendant could get out.

> While he was -- while they were walking towards the door, the defendant began making faces at Michelle and Adam, and the defendant told Adam he felt like hitting him, and he attempted to call -- the defendant attempted to call Adam Stump out two or three times.

Adam Stump refused and attempted to close the door so that he could lock it. And when Adam Stump leaned forward to grab the door, that's when the defendant struck him in the left side of the jaw and -- jaw and neck.

The -- Officer Smith was able to -- from the Bangor Police Department was able to see Mr. Stump's neck and jaw were visibly red and swollen, and Mr. Stump stated to the officer and the officer would testify in court that part of his tooth came out, chipped his tooth and -- when the defendant hit him in the mouth. And he was able to close the door, and the defendant eventually walked off.

*Sentencing Ex.* 5D (*Rule 11 and Sentencing*), 10:14-12:5.

After the prosecutor described this evidence, Mr. Ayotte acknowledged he had heard what the Government said about the evidence the prosecutor believed she could produce at trial. *Id.* at 12:13-16. Emphasizing that he "didn't hit Mr. Stump," Mr. Ayotte admitted that he "closed the door on Mr. Stump's face." *Id.* at 15:1-3. He went on to say: "I closed the door on his face, and, if he got a red mark on his face on that account, then that is what happened. . . . I don't want to argue the fact." *Id.* at 15:6-10.

Mr. Ayotte maintains that the plea colloquy does not establish that he was convicted for a knowing or intentional assault as opposed to a reckless one. *Def.'s Mem.* at 23. Under Maine law, a mens rea of recklessness is satisfied "with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result." 17-A M.R.S. § 35(3)(A) (2010). Maine law provides that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that it is practically certain that the person's conduct will cause such a result" and that "[a] person acts intentionally

with respect to a result of the person's conduct when it is the person's conscious object to cause such a result."  17-A M.R.S. §§ 35(1)(A), (2)(A) (2010).

The Court readily concludes that if it were acting as a fact-finder, it would likely have found, if asked, that Mr. Ayotte committed this assault either intentionally or knowingly.  Although it is conceivable that a person could recklessly shut a door so near another person that he could be convicted of an assault in Maine, Mr. Ayotte admitted that he "closed the door on Mr. Stump's face."[9] *Sentencing Ex. 5D* at 15:1-2. His statement suggests deliberate, not accidental conduct.  Moreover, the prosecutor stated that Mr. Stump would testify that just prior to closing the door on Mr. Stump's face, Mr. Ayotte told Mr. Stump that "he felt like hitting him" and "attempted to call Adam Stump out two or three times." *Sentencing Ex.* 5D at 11:17-23.  Finally, Mr. Ayotte closed the door with such force that it chipped one of Mr. Stump's teeth and injured his neck and jaw, and it is reasonable to conclude that in closing the door with such force, Mr. Ayotte either intended to hurt Mr. Stump or knew that by doing so, he would hurt him.  *Id.* at 11:24-12:4.

---

[9]      After Mr. Ayotte admitted that he closed the door on Mr. Stump's face, the presiding Justice asked if this was an *Alford* plea and, after consulting with his client, the defense attorney said that "it sounds like it's more of an *Alford* plea." *Sentencing Ex. 5D* at 15:11-21; *see North Carolina v. Alford*, 400 U.S. 25 (1970).  In accepting Mr. Ayotte's guilty plea, the presiding Justice described it as a "no contest or *Alford* plea." *Sentencing Ex. 5D* at 20:16-17.

      "In its strictest sense, . . . an '*Alford* plea' refers to a defendant who pleaded guilty but maintained that he is innocent." *United States v. Tunning*, 69 F.3d 107, 110 (6th Cir. 1995).  The Court does not view Mr. Ayotte's admission that he "closed the door on [Mr. Stump's] face" to be an assertion of innocence.  In any event, Mr. Ayotte described the guilty plea as "no contest," *Def.'s Mem.* at 22, and has not asserted that the nature of his guilty plea to the 2010 assault affects the ACCA analysis.

But in performing a *Taylor / Shepard* analysis, the Court may not act as a fact-finder. Instead, the Court must assess whether the *Taylor / Shepard* documents demonstrate "facts to which a defendant actually and necessarily pleaded in order to establish the elements of the offense." *Patel*, 2013 U.S. Dist. LEXIS 2315, *17 (quoting *Atkinson v. Holder*, 678 F.3d 138, 146 (2d Cir. 2012)). The plea colloquy in this case does not support a "necessary inference" as to Mr. Ayotte's level of intent in forcefully closing the door, because "there is no statement in [Mr. Ayotte's] plea colloquy admitting" that it was Mr. Ayotte's "conscious object" to strike Mr. Stump or that Mr. Ayotte was "practically certain" that the door would strike Mr. Stump.[10] *Id.* at *16-17 (quoting *Wala v. Mukasey*, 511 F.3d 102, 110 (2d Cir. 2007)); 17-A M.R.S. § 35(1)(A), (2)(A) (2010).

## 2. Step Two: Determining Whether the Offense of Conviction Is Categorically a Violent Felony

A knowing or intentional, harmful assault qualifies as a violent felony under the ACCA's force clause; reckless assault "is categorically not a violent felony." *Holloway*, 630 F.3d at 258 ("[T]he ACCA's force clause applies only where the offense at issue has as an element the use of 'violent force—that is, force capable of causing physical pain or injury to another person'") (quoting *Johnson*, 130 S. Ct. at

---

[10] "However improbable" it may be that Mr. Ayotte acted recklessly, it does not seem any "more improbable" than that Nupur Patel was engaged in a foolish college prank in taking property from dorm rooms on a college campus, or that Marcin Wala took jewelry from a residence in order to lend it to his girlfriend for a night on the town and then to return it. *See Patel*, 2013 U.S. App. LEXIS 2315 at *15-17 (discussing *Wala*, 511 F.3d at 109-110). Under the modified categorical approach, sometimes the "defendant comes out ahead. This is hardly the most jarring example." *Campbell*, 698 F.3d at 35, 35 n.8 (citing *United States v. Beardsley*, 691 F.3d 252 (2d Cir. 2012), where defendant admitted that he touched his daughter's genitals inappropriately, but his conviction for endangering the welfare of a child did not qualify as a conviction "under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward").

1271); *id.* at 261. As with the 2005 Assault conviction, "if at least one of the possible offenses of conviction would not qualify as a violent felony, the conviction is unusable for ACCA purposes." *Holloway*, 630 F.3d at 257. Here, the statute under which Mr. Ayotte was convicted includes reckless assault, and the *Taylor* / *Shepard* documents do not support narrowing the offense of conviction to exclude reckless assault. As reckless assault is categorically not a violent felony, Mr. Ayotte's 2010 Assault conviction is "unusable for ACCA purposes." *Id.*

### E. Due Process Clause

Mr. Ayotte contends that the ACCA violates the Due Process Clause, arguing specifically that the Court should decline to apply it under "the void-for-vagueness doctrine, the rule of lenity, and the proscription of the novel interpretation of criminal statutes by courts." *Def.'s Mem.* at 25-35. However, the Supreme Court held in *Sykes* that the ACCA's residual clause is constitutional. *Sykes*, 131 S. Ct. at 2277. The *Sykes* Court noted that the residual clause "may at times be more difficult for courts to implement" than a more-detailed provision but concluded that it "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.'" *Id.* (quoting *Chicago v. Morales*, 527 U.S. 41, 58 (1999)).

Among the Supreme Court Justices, only Justice Scalia has taken the position that the residual clause is unconstitutionally vague. *See Derby v. United States*, 131 S. Ct. 2858, 2859 (2011) (Scalia, J., dissenting from the denial of certiorari in four residual clause cases) ("I would grant certiorari, declare ACCA's

residual provision to be unconstitutionally vague, and ring down the curtain on the ACCA farce playing in federal courts throughout the Nation"); *Sykes*, 131 S. Ct. at 2284 (Scalia, J., dissenting) ("We should admit that ACCA's residual provision is a drafting failure and declare it void for vagueness"). This Court is bound by the majority view on the Supreme Court that the residual clause is constitutional.

Furthermore, while the modified categorical approach does pose practical challenges in certain cases, only one of Mr. Ayotte's prior convictions (the 2010 Assault conviction) arguably presents such a case, and the Court has concluded that this conviction may not be counted as an ACCA predicate offense. The two disputed convictions that count as predicate offenses are the 1998 Gross Sexual Assault conviction and the 2007 Assault on an Officer conviction. The 1998 Gross Sexual Assault conviction was for an offense that is markedly similar to and riskier than extortion, an enumerated offense, and the 2007 Assault on an Officer conviction was for an offense indistinguishable from an offense that has been ruled a violent felony by the First Circuit. Neither of these prior convictions provides a basis for an as-applied void-for-vagueness challenge or for the application of the rule of lenity.

Finally, the Court is skeptical to the extent Mr. Ayotte is claiming that he was caught unaware that his record of persistent criminal conduct might result in a significantly enhanced sentence if he were to illegally possess a firearm. Sentencing courts consider the nature and scope of a defendant's criminal history in determining an appropriate sentence and recidivists like Mr. Ayotte typically receive harsher sentences given the increased danger they have proven they pose to

society. Although it is the rare defendant who would be aware of the specific provisions of the ACCA, Mr. Ayotte can hardly claim he was unaware that he would likely face an escalated sentence if he possessed a firearm after committing a series of felonies, a number of which involved violence. Here, Mr. Ayotte qualifies for the ACCA's enhanced penalties because by the time he illegally possessed a firearm, he had previously been convicted of committing a burglary, committing a gross sexual assault, and assaulting an officer. Although the ACCA determination process has been criticized as presenting the troubling prospect of an unanticipated "post hoc characterization" of the facts underlying a prior conviction triggering a "substantial mandatory minimum sentence," *Oliveira*, 798 F. Supp. 2d at 326, Mr. Ayotte's case is not that case.

## III. CONCLUSION

The Court concludes that Mr. Ayotte's 1998 Gross Sexual Assault conviction and his 2007 Assault on an Officer conviction were for violent felonies under the ACCA, but that his 2005 and 2010 Assault convictions were not. Mr. Ayotte concedes that his 2000 Burglary conviction was for a violent felony. Because Mr. Ayotte has three previous convictions for violent felonies, he must be imprisoned for not less than fifteen years under 18 U.S.C. § 924(e).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 3rd day of April, 2013